**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

-------------------------------------------------------------

RYAN BARRETT

      Plaintiff,

            v.

DISTRICT OF COLUMBIA FIRE AND
EMERGENCY MEDICAL SERVICES, THE
GEORGE WASHINGTON UNIVERSITY
HOSPITAL, UNIVERSAL HEALTH
SERVICES, INC., PSYCHIATRIC INSTITUTE
OF WASHINGTON

      Defendant(s).

**Civ. No. 25-1075**

**COMPLAINT**

-------------------------------------------------------------

Plaintiff Ryan Barrett ("Plaintiff"), by and through his undersigned counsel EISENBERG & BAUM LLP alleges the following against District of Columbia Fire and Emergency Services ("DC FEMS"), The George Washington University Hospital ("GW Hospital"), and Psychiatric Institute of Washington ("PIW") (collectively, "Defendants"):

**INTRODUCTION**

1. This action arises from a series of flagrant civil rights violations against Plaintiff Ryan Barrett, a Deaf individual who communicates primarily through American Sign Language (ASL). He was subjected to involuntary detention, forced medication, and escalating restrictions on his liberty without the benefit of any effective communication whatsoever.

2. Defendants' outright failure to provide qualified American Sign Language (ASL) interpreters or other effective accommodations transformed a manageable situation involving a disoriented patient into a nightmare of miscommunication, unwarranted restriction of his liberty

and unjustified interventions that culminated in severe emotional and physical harm, lasting trauma, and significant damages.

3.    Despite clear statutory obligations to accommodate Deaf persons, Defendants utterly denied Plaintiff his fundamental right to communicate about his medical condition, treatment, and legal status, which caused him extended detention and forced medication based on Defendants' mistaken perceptions of his behavior due to their own negligence.

4.    Plaintiff seeks relief under Section 1557 of the Patient Protection and Affordable Care Act, Section 504 of the Rehabilitation Act, and the District of Columbia Human Rights Act, alleging that Defendants' actions reflect a systemic and dangerous disregard for the rights of Deaf individuals and pose a continuing threat to others requiring emergency medical and psychiatric services.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because this action arises under federal laws protecting civil rights, specifically Section 1557 of the Patient Protection and Affordable Care Act (42 U.S.C. § 18116) and Section 504 of the Rehabilitation Act (29 U.S.C. § 794).

6.    This Court has supplemental jurisdiction over Plaintiff's claims arising under the District of Columbia Human Rights Act, D.C. Code § 2-1402.01 et seq., pursuant to 28 U.S.C. § 1367(a) because these claims form part of the same case or controversy and share a common nucleus of operative facts with the federal claims.

7.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1)-(2) because all Defendants reside within the District of Columbia and because all events giving rise to these claims occurred within this district.

8.    All conditions precedent to jurisdiction have been satisfied, and Plaintiff has complied with any applicable notice requirements prior to filing this action.

9.    Plaintiff Ryan Barrett is a 35-year-old resident of the District of Columbia who has been Deaf since birth and uses American Sign Language ("ASL") as his primary and preferred mode of communication.

10.    Plaintiff requires ASL interpretation for effective communication in the context of medical care, legal issues, and other complex or high-stress interactions.

11.    Defendant District of Columbia Fire and Emergency Medical Services ("DC FEMS") is the primary provider of emergency medical services within the District of Columbia and is a department of the District of Columbia government with a principal place of business at 2000 14th Street NW, Washington, DC 20009.

12.    DC FEMS receives federal financial assistance through programs such as Medicare and Medicaid reimbursements and is therefore obligated to comply with federal disability rights laws requiring effective communication with Deaf individuals.

13.    Defendant The George Washington University Hospital (GW Hospital) is a private hospital operating at 900 23rd Street NW, Washington, DC 20037, and is licensed by the District of Columbia Department of Health.

14.    GW Hospital receives federal financial assistance, including Medicare and Medicaid reimbursements, and is therefore obligated to comply with Section 1557 of the Affordable Care Act and Section 504 of the Rehabilitation Act, which mandate nondiscrimination against individuals with disabilities.

15.    Universal Health Services, Inc. ("UHS") is a for-profit healthcare management corporation headquartered in King of Prussia, Pennsylvania. UHS is the sole corporate owner and

controlling entity of both The George Washington University Hospital and the Psychiatric Institute of Washington. UHS is responsible for establishing and implementing institutional policies governing patient care, staffing, training, and accessibility practices at both facilities.

16.    UHS receives federal financial assistance, including Medicare and Medicaid funds, and is therefore obligated to comply with Section 1557 of the Affordable Care Act and Section 504 of the Rehabilitation Act. At all relevant times, UHS acted through its agents, subsidiaries, and employees, including staff at GW Hospital and PIW, and is vicariously liable for their conduct.

17.    Defendant Psychiatric Institute of Washington (PIW) is a private psychiatric hospital operating at 4228 Wisconsin Avenue NW, Washington, DC 20016, and is similarly licensed by the District of Columbia Department of Health.

18.    PIW receives federal financial assistance through programs such as Medicare and Medicaid, rendering it subject to the same federal laws that require effective communication with Deaf patients.

19.    Each Defendant is a "health program or activity" under Section 1557 of the Affordable Care Act, a "program or activity receiving Federal financial assistance" under Section 504 of the Rehabilitation Act, and a "place of public accommodation" under the District of Columbia Human Rights Act.

20.    At all relevant times, each Defendant acted through its employees, agents, representatives, and contractors who were acting within the scope of their employment or agency, establishing vicarious liability for each institution under the doctrine of *respondeat superior*.

21.    Despite receiving federal funds and having a legal obligation to adopt policies and trainings aimed at preventing discrimination against Deaf individuals, each Defendant failed to put

in place effective measures to ensure that Plaintiff could understand and participate in his medical care, leading directly to the violations alleged herein.

## FACTUAL ALLEGATIONS

**A.      The Initial Emergency Response**

22.      In the evening of May 1, 2024,  Plaintiff experienced anxiety and disorientation after consuming legally purchased psilocybin mushrooms as part of a personal wellness exploration, prompting a concerned housemate to call emergency services.

23.      DC FEMS dispatched EMS units to Plaintiff's residence at 1710 Montello Avenue NE in Washington, DC.

24.      EMS records show that responders found Plaintiff rolling around on the ground and, rather than making any attempt to establish communication, relied on Metropolitan Police Department officers to restrain him physically, disregarding the possibility that Plaintiff's behavior was due to a communication barrier and his inability to hear their commands.

25.      Despite the obvious need for communication assistance, none of the EMS personnel documented any effort to identify Plaintiff's Deaf status, contact dispatch for ASL interpretation assistance, communicate in writing, or use any visual aids to facilitate basic communication.

26.      At approximately 8:20 PM, EMS records note that personnel administered 5mg of Versed (midazolam) intramuscularly to Plaintiff without obtaining informed consent or exploring alternative methods of communication.

27.      While the EMS records claim that Plaintiff's blood pressure could not be obtained due to his mental status, the failure to recognize that the communication barrier was causing confusion epitomizes the discriminatory neglect that set the stage for subsequent violations.

**B.      Treatment at GW Hospital Emergency Department**

28.      EMS transported Plaintiff to the GW Hospital Emergency Department at approximately 8:41 PM, where the hospital's intake records incorrectly labeled him as "hard of hearing" and listed "EMAIL" as his preferred communication method, an inexplicable choice for an emergency context and a clear indication of GW Hospital's failure to properly assess his needs.

29.      Between 9:09 PM and 9:25 PM, GW Hospital staff administered four powerful medications to Plaintiff, including haloperidol, midazolam, and diphenhydramine, without any documented effort to obtain informed consent through an effective means of communication. Specifically, at 9:09 PM, staff administered 5mg of haloperidol; at 9:09 PM, they administered 2mg of midazolam; at 9:24 PM, they administered another 5mg of haloperidol; and at 9:25 PM, they administered 25mg of diphenhydramine - all without explaining the purpose, risks, or potential side effects of these medications in a language he could understand.

30.      At approximately 9:25 PM, hospital staff applied four-point hard locking restraints to all of Plaintiff's extremities. No one explained the reasons for these restraints, advised Plaintiff of his rights while restrained, or informed him of any criteria for release from them in any comprehensible way.

31.      Plaintiff's vital signs remained largely stable, with a blood pressure of 132/84, a pulse of 98, and a respiratory rate of 16, indicating that the abrupt resort to restraints and heavy medication was driven by a misunderstanding of Plaintiff's behavior rather than a genuine medical crisis.

32.      Although Plaintiff attempted to sign and convey his Deaf status, the hospital records repeatedly describe his efforts as "agitation" and "screaming," revealing a complete failure to

recognize that he was trying to communicate and a callous disregard for his attempts to be understood.

33.    Nearly three hours after Plaintiff's admission, at approximately 11:55 PM, staff made their first documented attempt to provide interpretation services by using an iPad-based Video Remote Interpreting (VRI) system. However, the medical records show that this VRI had poor video quality, inadequate internet connectivity, and improper positioning, rendering it largely ineffective and causing further distress to Plaintiff.

**C.    Denial of Communication Access and Escalating Restrictions**

34.    Once staff attempted even this limited form of VRI, Plaintiff immediately provided coherent information about his medical history, explained the events leading to his anxiety, expressed concern for his dog's welfare, and apologized for any disruption, demonstrating his capacity for calm communication when provided the right means.

35.    Despite this evidence of Plaintiff's ability to communicate effectively when given an interpreter, GW Hospital did not maintain consistent ASL access for him and documented further signs of "non-compliance" whenever Plaintiff resorted to ASL to express concerns. Throughout the night of May 1-2, 2024 Plaintiff made at least six requests for an in-person ASL interpreter, all of which were ignored.

36.    Laboratory testing conducted at GW Hospital showed only cannabinoids and benzodiazepines in Plaintiff's system, the latter presumably resulting from the hospital's own administration of midazolam, contradicting any assumption that he was severely intoxicated.

37.    At approximately 12:47 AM on May 2, 2024, GW Hospital initiated involuntary commitment proceedings (FD-12) without any meaningful communication to Plaintiff regarding

the legal basis for this action, his right to challenge it, or the process of involuntary commitment. No qualified interpreter was provided to explain these critical legal matters, depriving Plaintiff of his due process rights.

**D.      Extended Detention and Continuing Violations**

38.      By the morning of May 2, ED physician notes indicated that Plaintiff was awake, alert, and oriented, with "forward thinking" and appropriate concerns about his service dog's care, which underscores that Plaintiff was not experiencing a psychotic break but rather suffering from inadequate communication access.

39.      From 8:00 AM to 3:40 PM on May 2, multiple psychiatric evaluations were conducted with no qualified interpreter, leading hospital staff to misinterpret Plaintiff's confusion as evidence of a severe mental illness rather than recognizing it as a predictable result of a communication barrier.

40.      At approximately 7:49 PM on May 2, GW Hospital transferred Plaintiff to the Psychiatric Institute of Washington (PIW) against his expressed wishes, without explaining the reason for transfer, identifying the destination facility in a comprehensible manner, or providing any interpreter to enable Plaintiff to discuss his concerns.

**E.      Continuing Violations at Psychiatric Institute of Washington**

41.      Upon arrival at PIW, staff recorded Plaintiff's Deaf status yet failed to secure qualified ASL interpretation services throughout his four-day involuntary detention from May 2 to May 6, 2024. This constitutes a blatant disregard for Plaintiff's clearly established need for communication access.

42. In place of proper interpretation, PIW staff attempted lip-reading, basic gestures, written notes, and speaking loudly, none of which were effective for the complex discussions needed to evaluate Plaintiff's psychiatric status and treatment plan. These attempts were not only inadequate but also demeaning and further isolated Plaintiff.

43. Staff made treatment decisions without ever obtaining Plaintiff's informed consent through accessible communication and conducted psychiatric evaluations that were fundamentally flawed because Plaintiff could not understand the questions being asked.

44. PIW staff announced facility activities, treatment schedules, and crucial information exclusively through a public address system, leaving Plaintiff excluded from meaningful participation in therapeutic programs. He was also unable to communicate with his family for the entirety of his detention because his phone was taken from him on May 1st and not returned until May 6th, 2024.

45. The medical records reveal that any time Plaintiff tried to use ASL or otherwise demand an interpreter, staff deemed him non-compliant, attributing his lack of engagement to behavioral issues rather than recognizing their responsibility to ensure effective communication.

46. Despite Plaintiff's repeated requests, no documentation in PIW's records indicates an attempt to secure in-person ASL interpreters, despite the fact that Plaintiff repeatedly requested such services and was confined in a setting where communication is central to psychiatric treatment.

**F.     Direct Harm and Ongoing Damages**

47. Defendants' collective failures caused Plaintiff to endure four days of needless involuntary detention, multiple forced medications, and episodes of physical restraint that could have been avoided had proper communication been established at the outset.

48. Plaintiff suffered significant physical discomfort and emotional distress during his 98-minute restraint at GW Hospital, which was imposed without providing any explanation in a language he could understand.

49. The sequence of forceful treatments and confusion stemming from the absence of ASL interpretation undermined Plaintiff's autonomy, resulted in the extension of his involuntary commitment, by approximately three days, and prolonged the separation from his service dog, causing additional emotional harm.

50. Plaintiff incurred substantial hospital bills, ambulance fees, and subsequent therapy costs tied directly to the trauma inflicted by these events, and he continues to grapple with anxiety and fear regarding future encounters with medical institutions.

## G.   Systemic Failures and Institutional Deficiencies

51. Defendants failed to establish or enforce adequate policies or procedures to guarantee timely and reliable ASL interpretation during emergencies and psychiatric admissions, thereby violating their legal obligations.

52. DC FEMS lacked protocols to secure remote or in-person interpretation for Deaf patients encountered in the field, instead relying on force in situations where simple communication could have de-escalated the conflict.

53.     GW Hospital failed to ensure consistent access to interpreters, leaving staff dependent on a malfunctioning VRI system that they were neither trained to operate nor capable of using effectively.

54.     PIW similarly fell short of the standard of care for Deaf patients by failing to implement a coherent plan to enable individuals reliant on ASL to meaningfully participate in their psychiatric evaluations and treatment.

55.     Universal Health Services, Inc. failed to ensure that its owned and operated facilities, including GW Hospital and PIW, had policies and procedures in place to meet their federal obligations. UHS failed to ensure that staff were properly trained to recognize and accommodate Deaf patients, and failed to monitor or enforce compliance with accessibility laws and standards at its facilities. These failures reflect systemic and institutional shortcomings traceable to UHS's control and management practices.

56.     The Defendants' inadequate training, absence of written policies, and disregard for Deaf cultural competency issues demonstrate deliberate indifference, posing an ongoing and significant threat to Deaf individuals requiring emergent care in the District of Columbia.

## H.     Lasting Impact and Chilling Effect

57.     The traumatic events he experienced at the hands of Defendants have led to ongoing anxiety, depression, and a heightened distrust of healthcare settings, causing him to delay or avoid seeking necessary treatment for fear of experiencing similar violations.

58.     Due to the Defendant's actions, the plaintiff is also afraid to leave his home.

59.    Plaintiff now requires specialized therapy to address the psychological harm caused by Defendants' discriminatory conduct, further compounding the financial and emotional burden of these events.

## CAUSES OF ACTION

**CLAIM I:    Violations of the Patient Protection and Affordable Care Act**

60.    Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

61.    At all times relevant to this action, Section 1557 of the Patient Protection and Affordable Care Act has been in full force and effect and has applied to Defendants' conduct.

62.    At all times relevant to this action, Plaintiff has had substantial limitations to the major life activities of hearing and speaking and has been an individual with a disability within the meaning of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116.

63.    At all times relevant to this action, Defendants received federal financial assistance, including Medicare and Medicaid reimbursements, and have been principally engaged in the business of providing health care. Thus, Defendants are a health program or activity receiving federal financial assistance under 42 U.S.C. § 18116(a).

64.    Under Section 1557 of the Patient Protection and Affordable Care Act, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116.

65.     At all times relevant to this action, Plaintiff's primary language for communication has been American Sign Language and he has a limited ability to read, write, speak, or understand English. Plaintiff has thus been an individual with limited English proficiency within the meaning of Section 1557 of the Patient Protection and Affordable Care Act.

66.     Under the Affordable Care Act, federal regulations adopt "the standards found at 28 CFR 35.160 through 35.164," which come from Title II of the Americans with Disabilities Act. 45 C.F.R. § 92.102(a).

67.     Under the Affordable Care Act, federal regulations provide that a "[covered] entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a [covered] entity. . . . In determining what types of auxiliary aids and services are necessary, a [covered] entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 35.160(b), *adopted by* 45 C.F.R. § 92.102(a). This regulation authoritatively construes the Affordable Care Act and was violated by Defendants.

68.     Under the Affordable Care Act, federal regulations provide that a covered entity "shall take reasonable steps to ensure meaningful access to such programs or activities by limited English proficient individuals," 45 C.F.R. § 92.101(a), and that where an individual "requires the provision of language assistance services, such services must be provided free of charge, be accurate and timely, and protect the privacy and independence of the individual with limited English proficiency. Language assistance services may include: (i) Oral language assistance, including

interpretation in non-English languages provided in-person or remotely by a qualified interpreter for an individual with limited English proficiency, and the use of qualified bilingual or multilingual staff to communicate directly with individuals with limited English proficiency; and (ii) Written translation, performed by a qualified translator, of written content in paper or electronic form into languages other than English." 45 C.F.R. § 92.101(b)(2)(i)–(iv). This regulation authoritatively construes the Affordable Care Act and was violated by Defendants.

69. Federal regulations implementing the ACA further require that a covered entity that provides individuals with disabilities "qualified interpreters via VRI services shall ensure that it provides–(1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication; (2) A sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of his or her body position; (3) A clear, audible transmission of voices; and (4) Adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI." 28 C.F.R. § 35.160 (*cited by* 28 C.F.R. §§ 35.104 & 36.303(f); in turn *cited by* 45 C.F.R. § 92.102(b)(1)(i)).

70. A VRI system that does not meet all of these standards is not an "effective method[] of making aurally delivered materials available to individuals with hearing impairments"— meaning a non-compliant VRI system does not count as an auxiliary aid or service. 42 U.S.C. § 12103(1)(A); 28 C.F.R. § 36.104; 28 C.F.R. Pt. 36 App. A ("[T]he Department has established performance standards for VRI in § 36.303(f). The Department recognizes that reliance on VRI may not be effective in certain situations, such as those involving the exchange of complex

information or involving multiple parties . . . and using VRI in those circumstances would not satisfy a public accommodation's obligation to provide effective communication.").

71. As set forth above, Defendants discriminated against Plaintiff on the basis of his disability in violation of the ACA and its implementing regulations.

72. The ACA, by incorporating the enforcement mechanism of the Rehabilitation Act, extends a cause of action to Plaintiff—that is, "any person aggrieved" by discrimination in violation of the Rehabilitation Act.  42 U.S.C. § 18116(a).

73. The Rehabilitation Act—and by extension, the ACA—explicitly authorize the remedies available under 42 U.S.C. § 1981a. Specifically, 29 U.S.C. § 794a(a)(2) provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

74. Accordingly, 29 U.S.C. § 794a(a)(2) provides that anyone bringing claims of discrimination against a recipient of federal funding may avail themselves of the remedies in 42 U.S.C. § 2000e-5(e)(3), which in turn states: "*In addition to* any relief authorized by section 1981a of this title . . . an aggrieved person may obtain [other] relief . . . ." 42 U.S.C. § 2000e-5(e)(3)(B) (emphasis added). And 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

75. As such, "*any person* aggrieved by *any act or failure to act by any recipient of Federal Assistance . . . under section 794*" is entitled to the "*remedies*, procedures, and rights" not only in "title VI of the Civil Rights Act of 1964," but also in "subsection (e)(3) of section 706 of

such Act (42 U.S.C. 2000e–5)." 29 U.S.C. § 794a(a)(2) (emphasis added).

76.    42 U.S.C. § 2000e-5(e)(3), in turn, authorizes certain relief "[i]n addition to any relief authorized by section 1981a," and 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

77.    As set forth above, Defendants discriminated against Plaintiff on the basis of his disability in violation of the ACA and its implementing regulations.

78.    Defendants have failed to implement policies, procedures, and training of staff necessary to ensure compliance with the ACA.

79.    As set forth above, Defendants discriminated against Plaintiff on the basis of his disability in violation of the ACA and its implementing regulations and, by doing so, aggrieved Plaintiff under the statute and its implementing regulations.

80.    Plaintiff is also entitled to other forms of compensatory damages beyond emotional distress damages. The defendant is subject to remedies traditionally available in suits for breach of contract. Here, when individuals like Plaintiff need healthcare treatment, they expect that they will be able to communicate with their healthcare providers about their care. Plaintiff also had an expectation interest in being able to communicate with and be informed about his care by Defendants' staff in his primary or preferred language or through some other equally effective form of communication because that is what federal antidiscrimination laws require. Plaintiff's expectations also stem from the Defendants' policies and the patient's bill of rights, which was generated in response to the Affordable Care Act.

81.    Defendants denied Plaintiff these expectation interests by failing to accommodate him disability and failing to provide equal treatment that it gives to non-disabled patients. Accordingly, the Plaintiff should be entitled to compensatory damages under his expected interest.

82.     Plaintiff is therefore entitled to declaratory and injunctive relief, nominal damages, compensatory damages, and attorneys' fees, costs, and disbursements for the injuries and loss he sustained as a result of the Defendants' discriminatory conduct and deliberate indifference as alleged under 42 U.S.C. § 18116(a).

**CLAIM II:     Violations of Section 504 of the Rehabilitation Act**

83.     Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

84.     At all times relevant to this action, Section 504 of the Rehabilitation, 29 U.S.C. § 794, has been in full force and effect and has applied to Defendants' conduct.

85.     At all times relevant to this action, Plaintiff has had substantial limitations to the major life activities of hearing and speaking and has been an individual with a disability within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(9); 42 U.S.C. § 12102(2).

86.     At all times relevant to this action, Defendants have been a program or activity receiving federal financial assistance under 29 U.S.C. § 794(b).

87.     Section 504 of the Rehabilitation Act provides that no "otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

88.     Under the Rehabilitation Act, federal regulations define discriminatory actions to include "[a]fford[ing] a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 45 C.F.R. § 84.4(b)(1)(ii). This regulation authoritatively construes the Rehabilitation Act and was violated by Defendants.

89.     Under the Rehabilitation Act, federal regulations prohibit recipients of federal funds

from "otherwise limiting a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service." 45 C.F.R. § 84.4 (b)(1)(vii). This regulation authoritatively construes the Rehabilitation Act and was violated by Defendants.

90.    Under the Rehabilitation Act, federal regulations prohibit recipients of federal funds from "[a]fford[ing] a qualified handicapped person an opportunity to receive benefits or services that is not equal to that offered nonhandicapped persons"). 45 C.F.R. § 84.52(a)(2). This regulation authoritatively construes the Rehabilitation Act and was violated by Defendants.

91.    Under the Rehabilitation Act, federal regulations prohibit recipients of federal funds from providing services and benefits "in a manner that limits or has the effect of limiting the participation" of the person with impaired hearing. 45 C.F.R. § 84.52(a)(4). This regulation authoritatively construes the Rehabilitation Act and was violated by Defendants.

92.    Defendants discriminated against Plaintiff solely on the basis of his disability by denying her meaningful access to the services, programs, and benefits Defendants offer to other individuals and by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of Section 504 of the Rehabilitation Act.

93.    Defendants have failed to implement policies, procedures, and training of staff necessary to ensure compliance with the Rehabilitation Act and its implementing regulations.

94.    Plaintiff is entitled to injunctive relief; attorney's fees, costs, and disbursements; and compensatory damages for the injuries and loss he sustained as a result of Defendants' discriminatory conduct and deliberate indifference under 29 U.S.C. § 794a.

95.    The Rehabilitation Act explicitly authorizes the remedies available under 42 U.S.C. § 1981a. Specifically, 29 U.S.C. § 794a(a)(2) provides that "[t]he remedies, procedures, and rights

set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

96.    Accordingly, 29 U.S.C. § 794a(a)(2) provides that anyone bringing claims of discrimination against a recipient of federal funding may avail themselves of the remedies in 42 U.S.C. § 2000e-5(e)(3), which in turn states: "*In addition to* any relief authorized by section 1981a of this title . . . an aggrieved person may obtain [other] relief . . . ." 42 U.S.C. § 2000e-5(e)(3)(B) (emphasis added). And 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

97.    As such, "*any person* aggrieved by *any act or failure to act by any recipient of Federal Assistance . . . under section 794*" is entitled to the "*remedies*, procedures, and rights" not only in "title VI of the Civil Rights Act of 1964," but also in "subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5)." 29 U.S.C. § 794a(a)(2) (emphasis added).

98.    42 U.S.C. § 2000e-5(e)(3), in turn, authorizes certain relief "[i]n addition to any relief authorized by section 1981a," and 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

99.    As set forth above, Defendants discriminated against Plaintiff on the basis of his disability in violation of the ACA and its implementing regulations and, by doing so, aggrieved Plaintiff under the statute and its implementing regulations.

100.    Plaintiff is also entitled to other forms of compensatory damages beyond emotional distress damages. Defendants are subject to remedies traditionally available in suits for breach of contract. Here, when individuals like Plaintiff need healthcare treatment, they expect that they will

be able to communicate with their healthcare providers about their care. Plaintiff also had an expectation interest in being able to communicate with and be informed about his care by Defendants' staff in his primary or preferred language or through some other equally effective form of communication because that is what federal antidiscrimination laws require. Plaintiff's expectations also stem from Defendants' policies and the patients' bill of rights, which was generated in response to the Rehabilitation Act.

101.    Defendant denied Plaintiff these expectation interests by failing to accommodate him disability and failing to provide equal treatment that it gives to non-disabled patients. Accordingly, the Plaintiff should be entitled to compensatory damages under her expected interest.

102.    Plaintiff is therefore entitled to declaratory and injunctive relief, nominal damages, compensatory damages, and attorneys' fees, costs, and disbursements for the injuries and loss he sustained as a result of the Defendants' discriminatory conduct and deliberate indifference as alleged under 42 U.S.C. § 18116(a).

## CLAIM III:   Violations of District of Columbia Human Rights Act

## D.C. Code § 2-1402.01 et seq

103.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

104.    At all times relevant to this action, the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1402.01 et seq., was in full force and effect.

105.    Defendants are public accommodations under the DCHRA, which mandates that individuals with disabilities have full and equal enjoyment of the services, facilities, privileges, and advantages of all public accommodations.

106.    By refusing to provide adequate auxiliary aids and services, failing to procure

qualified interpreters, and repeatedly ignoring Plaintiff's requests for effective communication, Defendants discriminated against Plaintiff on the basis of his disability in violation of the DCHRA.

107.    Defendants' conduct prevented Plaintiff from accessing the same quality and scope of medical care and psychiatric treatment through equal participation and effective communication that non-disabled patients receive, causing him to experience prolonged involuntary detention, forced medication, and significant emotional distress.

108.    As a direct and proximate result of Defendants' actions, Plaintiff was deprived of his statutory rights under the DCHRA and suffered humiliation, frustration, anxiety, and other damages.

109.    Plaintiff is entitled to injunctive relief to ensure that Defendants modify their policies, provide adequate training to staff, maintain contracts with qualified ASL interpreters, and acquire functional VRI equipment to prevent future discrimination against deaf or hard-of-hearing patients.

110.    Under the DCHRA, Plaintiff is also entitled to compensatory damages (including emotional distress), attorneys' fees, and costs for the injuries he has suffered as a result of Defendants' unlawful conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Ryan Barrett respectfully requests that this Court enter judgment in his favor and award the following relief:

A.    Declare that Defendants' policies, practices, and conduct as alleged herein violated Plaintiff's rights under Section 1557 of the Patient Protection and Affordable Care Act, Section 504 of the Rehabilitation Act, and the District of Columbia Human Rights Act

B.      Enjoin and Restrain Defendants from engaging in such discriminatory practices and require Defendants to develop and implement written policies and procedures to ensure effective communication with deaf and hard-of-hearing patients, including the hiring or contracting of qualified in-person ASL interpreters, maintaining and properly operating VRI systems that meet federal standards, and regularly training staff on disability rights and effective communication requirements;

C.      Award to Plaintiff:

    i.      Compensatory Damages in an amount to be proven at trial to compensate Plaintiff for emotional distress, pain and suffering, loss of autonomy, medical expenses, and other actual damages caused by Defendants' unlawful conduct

    ii.      Nominal Damages to recognize the deprivation of Plaintiff's rights under federal and District law.;

    iii.      Punitive Damages where permissible and warranted by law, to punish and deter Defendants' deliberate indifference and willful misconduct;

    iv.      Award Attorneys' Fees and Costs under 29 U.S.C. § 794a, 42 U.S.C. § 18116(a), D.C. Code § 2-1403.13(a), and/or any other applicable provision, including expert fees, litigation expenses, and other costs reasonably incurred

    v.      Prejudgment and post-judgment interest at the highest rate allowed by law on all amounts due; and

vi.   Such other and further relief as this Court deems just and proper to effectuate the purposes of the laws violated, including any additional equitable relief necessary to ensure compliance with the law.

Dated: April 9, 2025                               Respectfully submitted,

Andrew Rozynski, Esq. (NY# 5054465)
arozynski@eandblaw.com
EISENBERG & BAUM, LLP
24 Union Square East, PH
New York, NY 10003
212-353-8700 (tel.)
212-353-1708 (fax)
Attorneys for Plaintiff